IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RON L.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | No. 20 C 3436 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(I), 423, four and a half years ago in December of 2017. (Administrative Record (R.) 161-62). He claimed that he became disabled as of November 1, 2016, due to a constellation of issues: blindness in his right eye, losing sight in left eye, bleeding ulcers, triple bypass surgery, "had a brain tumor," plantar fasciitis in right foot, Achilles tendinitis in right foot, numbness in right hand, and mild headaches. (R. 181, 184). He said his disability ended in April 2017. (R. 161). Over the next two and a half years, the plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. Plaintiff filed suit under 42 U.S.C. § 405(g) on June 12, 2020, and the case was fully briefed as of March 29, 2021. [Dkt. #19]. The parties then consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) a year later on March 29, 2022. [Dkt. #21]. It is the ALJ's decision that is before the court

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

for review. *See* 20 C.F.R. §§404.955; 404.981. Plaintiff asks the court to remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

### A.

Plaintiff was born on July 29, 1962 (R. 161), making him about 54 years old when he claims he was unable to work. He has a high school education and one year of college. (R. 34). He has tried working a couple of times since his claimed onset date, but the jobs involved looking at computer screens, and he was unable to do that for any length of time due to vision problems in his remaining eye. (R. 34). He thought he could look at a computer screen for 15-20 minutes before his eye began burning, and he got a headache. (R. 36). He also got floaters all day and night, and flashes. (R. 40-41).

Plaintiff has had some serious medical issues over the years. In November 2015, Plaintiff underwent triple bypass surgery, followed by some GI bleeding that necessitated surgery for a duodenal ulcer. (R. 329). But he seems to have recovered well from these issues. The more troubling problems he has been left with seem to be with his vision. He lost an eye as a result of a tumor when he was 19 years old. More recently, a cataract has developed in his remaining eye that is seemingly causing floaters, flashes and blurred vision. As a result, the focus of the parties – and the court's review – will be on those issues.

On April 2017, Dr. Peter Kiefer diagnosed plaintiff with plantar fasciitis of the left foot. (R. 667). On June 19, 2017, plaintiff complained of pain in both feet. (R. 668). There was tenderness in plaintiff's right plantar fascia at the heel. Physical exam and review of systems were otherwise normal. (R. 669-70). Dr. Kiefer administered an injection in plaintiff's right heel, and improvement

was immediate and dramatic. (R. 670). On February 16, 2018, a physical exam was normal with the exception of arthralgias. (R. 692). Cardiovascular rate and rhythm, range of motion, and neurological signs were normal. (R. 693). Plaintiff continued to be diagnosed with coronary artery disease involving native coronary artery and native heart without angina pectoris; essential hypertension; hypercholesterolemia; and chronic gastric ulcer with hemorrhage. (R. 694).

Plaintiff continued treatment with Dr. Kiefer in May 2018, and exhibited tenderness in his right heel. (R. 728). Injections were again administered. (R. 729). He was diagnosed with chronic gastric ulcer with hemorrhage; plantar fasciitis; pseudopolposis of colon; and benign prostatic hyperplasia with urinary frequency. (R. 730). Dr. Kiefer added Flomax and Celebrex for Plaintiff's joint pains. (R. 730).

On April 24, 2017, plaintiff saw ophthalmologist John Winkler and complained of redness under his right eye prosthesis, blurred distance vision in the left eye, difficulty with small print in the left eye, constant floaters, and constant dryness. (R. 678). Dr. Winkler noted plaintiff had a cataract on the left, with moderate symptoms. (R. 678). His difficulty reading was constant all day, and his "floaters" would come and go of moderate severity. (R. 678). Dr. Winkler noted plaintiff was not using a computer. (R. 678). The doctor cataloged a number of issues: blurred distance vison, all day, moderate; difficulty reading, all day, moderate; floaters, constant, moderate; dryness, constant, moderate. (R. 678). Dr. Winkler diagnosed plaintiff with an age-related nuclear cataract of the left eye; and ulcerative blepharitis of the right upper eyelid. (R. 681).

On November 2, 2017, plaintiff was still having right eye pain, itching and swelling. (R. 673). In the left eye, he was experiencing sudden blurred vision and "wavy" vision intermittently. (R. 673). These issues were moderate, and came and went. (R. 673). Dr. Winkler noted dry eye

syndrome of the left tear gland and believed that plaintiff's intermittent blurred vision was "secondary to the tear film." (R. 676). The doctor prescribed artificial tears and Omega-3 fish oil tablets. (R. 676).

On March 14, 2018, plaintiff had a consultative exam with Dr. Liana Palacci in connection with his application for benefits. (R. 696-99). The doctor noted plaintiff's history of right eye surgery with multiple retinal detachments, prosthesis, triple coronary bypass surgery, and right plantar fasciitis. (R. 696). Corrected vision in plaintiff's remaining eye was 20/50. (R. 697). Physical exam was essentially normal – strength, reflexes, sensation, range of motion, and gait. (R. 698).

Plaintiff returned to Dr. Winkler on November 1, 2018. (R. 732). Plaintiff had an increase in "floaters" in his left eye over the past year. (R. 732). He was also seeing intermittent "flashes" which was worse at night. (R. 732). Plaintiff continued to have difficulty reading fine print, and his distance vision was blurry. (R. 732). Visual acuity in the remaining eye was 20/40. (R. 738). Dr. Winkler cataloged the following problems: floaters, comes and goes, moderate; flashes, comes and goes, moderate; difficulty reading, all day moderate; blurred distance vision, all day moderate. (R. 732). He diagnosed Plaintiff with age-related nuclear cataract of the left eye; dry eye syndrome of the bilateral lacrimal glands; and vitreous floaters in the left eye. (R. 735).

The medical expert who testified at plaintiff's hearing, Dr. Ronald Samurgen, recounted the medical record covering plaintiff's cardiac surgery and subsequent ulcer surgery, and treatment and recovery. (R. 48-49). The doctor noted that followup exams in December 2015, and in January, February, April, and December of 2016, were all essentially normal. (R. 49). He went over plaintiff's treatment for plantar fasciitis, and eye examinations and treatment. (R. 50-51). Dr.

4

Samurgen said he didn't think any of those impairments met or equaled a listing. (R. 52). Dr. Samurgen didn't think plaintiff's left eye issues – variously, 20/40 uncorrected vision or 20/50 with correction, flashes, and floaters -- constituted a severe impairment. (R. 51, 53). Limitation in field of vision and lack of depth perception were the major limitations plaintiff had. (R. 54).

**B.**

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a medical expert and a vocational expert, the ALJ determined the plaintiff had the following severe impairments: obesity, status post triple bypass, right eye blindness, and Barret's esophagus. (R. 17). The ALJ concluded that plaintiff's plantar fasciitis was non-severe. (R. 17-18). The ALJ then found plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, focusing on the listings for loss of visual acuity (2.02), and ischemic heart disease (4.04). (R. 18).

The ALJ then determined that plaintiff could perform light work with the following additional limitations:

> cannot climb ladders, ropes or scaffolds, work at unprotected heights, work with dangerous moving machinery, or operate commercial vehicles. He has poor depth perception.

(R. 33). The ALJ then summarized the plaintiff's allegations. He noted that plaintiff had been blind in his right eye since age 19 and had floaters in his left. The ALJ further noted that plaintiff alleged he can only walk two blocks, stand for no more than 15 minutes, did not feel safe driving, and could not look at a computer screen for more than 15 minutes. (R. 19). The ALJ then determined that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged

5

symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 19). The ALJ went on to discuss the medical record. He related that, following surgery and treatment for cardiac and gastric issues, diagnostic procedures were relatively unremarkable. (R. 20-21). The ALJ then stated that the plaintiff received a right eye prosthesis back in 1980, Since then, he has had some issues, but checkups had generally revealed no problems. The ALJ acknowledged issues with dry eye, floaters, and intermittent blurred vision. (R. 21).

As for medical opinions, the ALJ noted the medical expert testified that the plaintiff's impairments did not meet or equal a listed impairment. The ALJ further noted that the medical expert felt plaintiff could do light work but was limited by lack of depth perception. The ALJ said the doctor's opinion was persuasive because it was consistent with the medical evidence and plaintiff's activities. The ALJ later noted those activities to include walking around the block, walking his dog, mowing the lawn, vacuuming, making lunch, and attending to personal care. The ALJ said the opinions from the state agency reviewing physicians that plaintiff could do light work but had to avoid hazards were persuasive. The ALJ explained that they were consistent with the medical evidence and the testimony of the medical expert. (R. 22).

Next, the ALJ, relying on the testimony of the vocational expert, found that plaintiff could perform his past sedentary work as a telephone salesperson or sales manager. The vocational expert testified that a hypothetical person with the plaintiff's residual functional capacity could perform the sales manager job as described in the Dictionary of Occupational Titles and the telephone sales job as performed by the plaintiff. (R. 23). Accordingly, the ALJ found plaintiff not disabled and not

entitled to benefits under the Act. (R. 23).

## II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole, *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019), but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, 758 F.3d at 837.

The substantial evidence standard is a low hurdle to negotiate. *Biestek*, 139 S. Ct. at 1154; *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021). If reasonable minds could differ, the court must defer to the ALJ's weighing of the evidence. *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020). But, in the Seventh Circuit, at least thus far, the ALJ also has an obligation to build what the court has called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." As *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) put it: "we

cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." [2] *But see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis appearing in the record..."); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)("We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record."); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)("[District court] did not properly allocate the burden of proof on the causation element between the parties, ... No matter, because we may affirm on any basis that appears in the record.").

Of course, this is a subjective standard: one reader's Mackinac Bridge is another's rickety rope and rotting wood nightmare. But no matter what one's view of the "logical bridge" requirement, no one suggests that the "accurate and logical bridge" must be the equivalent of the Point Neuf. The subjectivity of the requirement makes it difficult for ALJs hoping to write

---

[2] The term "accurate and logical bridge" was first used by Judge Spottswood Robinson in a non-Social Security context in *Thompson v. Clifford*, 408 F.2d 154 (D.C.Cir. 1968), which said "'Administrative determinations must have a basis in law' and their force depends heavily on the validity of the reasoning in the logical bridge between statute and regulation." 408 F.2d at 167. Judge Posner, first used the phrase in a Social Security context in *Sarchet v. Chater*, 78 F.3d 305 (7th Cir. 1996) and would be the first to acknowledge that it was not meant as a self-defining test or formula. *Cf., United States v. Edwards*, 581 F.3d 604, 608 (7th Cir. 2009)("We recall Holmes's admonition to think things not words...."); *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 990 (7th Cir. 2004).

More recently, the Seventh Circuit, in a Social Security case explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

8

acceptable decisions that stand up to judicial scrutiny when challenged, or when upheld at the district court level and challenged again before the Seventh Circuit.

But, at the same time, the Seventh Circuit has also called the "logical bridge" requirement "lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). Indeed, prior to *Sarchet*, the Seventh Circuit "emphasize[d] that [it] d[id] not require a written evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence . . . in cases in which considerable evidence is presented to counter the agency's position." *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984). Later, in *Stephens v. Heckler*, 766 F.2d 284 (7th Cir. 1985), the court was more explicit when rejecting a plaintiff's argument that an ALJ failed to discuss his complaints of pain:

> We do not have the fetish about findings that Stephens attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).
>
> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do. . . . This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Id.*, at 287 (citations omitted). Or, as the court succinctly put it, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the

9

ALJ's reasoning, the ALJ has done enough." *Id*. at 287-88. In this instance, the ALJ left a bit too much of a gap from the evidence to his conclusion.

### III.

With the loss of an eye at age 19, and more recently, triple bypass surgery followed by episodes of gastric bleeding, the plaintiff has been through a lot. But, as his brief tacitly concedes, he has essentially recovered and mostly put those problems behind him. Certainly, a person with a heart condition has to be careful about exertion and stress, but with the sedentary residual functional capacity the ALJ arrived at, those concerns shouldn't be a problem. But, when the ALJ's decision is reviewed against the record, plaintiff's vision impairments are.

The plaintiff testified at some length as to his vision problems in his remaining eye: floaters, flashes, and blurred vision. (R. 34-36, 40-41). He specifically testified on how this limited his use of a computer screen. He couldn't look at one for very long at all, perhaps 15 or 20 minutes before he had to walk away. He tried taking a position or two that involved computers since his issues developed, and he couldn't manage it. Plaintiff consistently reported these problems to his ophthalmologist, who prescribed treatments. But the issues didn't go away.

The ALJ, while mentioning plaintiff's issues with reading computer screens, obviously didn't believe the plaintiff. He didn't have to, of course. The court must defer to an ALJ's evaluation of a plaintiff's subjective complaints unless it is "patently wrong." *Wilder v. Kijakazi*, 22 F.4th 644, 653 (7th Cir. 2022). *See also Deborah M. v. Saul*, 994 F.3d 785, 789 (7th Cir. 2021); *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). The question is whether the ALJ gives specific reasons for her evaluation that are supported by the record. *Deborah M.*, 994 F.3d at 789; *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). Here, the ALJ explained that the plaintiff's daily activities, the

objective medical evidence, and the medical expert's opinion undermined the plaintiff's allegations. (R. 22). But conclusions are not enough. What the ALJ really needed to explain was how those conclusions were arrived at. "[U]nfortunately... saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010).

      First, the daily activities. The ALJ was careful to say that he did not consider the plaintiff's activities "to be conclusive activity [he probably meant evidence] that the [plaintiff] could sustain the demands of full-time work activity." (R. 22). But he contradicted himself and also said that the plaintiff's daily activities . . . support the above residual functional capacity." (R.22). Since the residual functional capacity is "the most a person can do in a work setting despite the person's limitations," *Jeske v. Saul*, 955 F.3d 583, 593 (7th Cir. 2020), that's like equating the plaintiff's daily activities with working. Even the ALJ seemed to know that is not allowed. *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

      But that's just a bit of nit-picking the opinion for some clumsy wording. The more important problem is that plaintiff's daily activities don't, in any way imaginable, undermine his claim that he can't read computer screens for any length of time. The ALJ somehow thought that doing housework, laundry, mowing the lawn, and walking the dog all undermined that claim. Without any explanation, that conclusion is unpersuasive, to say the least. *See Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017)("But the ALJ did not explain why doing these household chores was inconsistent with [plaintiff's] description of her [limitations]. Nor is any inconsistency obvious, so the ALJ did not substantiate the finding that [plaintiff's] daily activities reveal any exaggeration of [plaintiff's] limitations."); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir.2011) ("An ALJ may

11

consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence."); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)("The ALJ should have explained the "inconsistencies" between [plaintiff's] activities of daily living (that were punctured with rest), his complaints of pain, and the medical evidence."). Blind people walk dogs – seeing eye dogs, of course – but they can't read an ordinary computer screen all day. Clearly, the ALJ's rationale makes no sense.

Then there's the medical record. It is true that "discrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010); *Britt v. Berryhill*, 889 F.3d 422, 426 (7th Cir. 2018); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). But, as with plaintiff's activities, the ALJ offers no explanation for *how* the reports from plaintiff's sessions with his ophthalmologist impeach his claim that he can't read a computer screen for very long. Dr. Winkler certainly accepted and attempted to treat plaintiff's issues, albeit without success. And he indicated that the likely cause was a cataract forming. The ALJ characterizes the doctor as saying plaintiff's vision was "acceptable", but the doctor said nothing of the kind. If the ALJ is referencing 20/40 or 20/50 corrected vision, that has nothing at all to do with floaters, flashes, and vision blurring off and on throughout the day.

That leaves to the medical expert's testimony as the only piece of evidence that could possibly support the ALJ's credibility determination. But, Dr. Samurgen said nothing about reading computer screens, and the ALJ didn't ask him. The doctor said plaintiff's "major limitations" were limitation in field of vision and lack of depth perception. (R. 53). He didn't question the medical findings of floaters and flashes; he simply said the doctor had not found retinal detachment. (R. 52). The need to stare at a computer screen for eight hours didn't come up until after the medical expert

was excused and the ALJ asked the vocational expert whether plaintiff could do his past work which involved reading a computer screen all day. (R. 57-58).

It must be remembered that the ALJ must consider all impairments in combination, whether severe or non-severe. *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018);*Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014). In other words, the ALJ can't just confine himself to "major limitations." Obviously, an inability to tolerate computer reading for more than 15 minutes with one eye, pales in comparison with the loss of the other eye. But it is still a limitation, and one that is not inconsistent with plaintiff's activities or the medical record. And, given the ALJ's finding that the plaintiff could read computer screens eight hours a day, five days a week, it is a significant limitation indeed. The ALJ's failure to account for it in his residual functional capacity finding, or logically explain it away, requires a remand of this case.

## CONCLUSION

For the foregoing reasons, the defendant's motion for affirmance [Dkt. #17] is denied, and this case is remanded to the Commissioner.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 7/5/22